Michigan Supreme Court
Lansing, Michigan 48909

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JUNE 20, 2003**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                       No. 120630

RICHARD J. MENDOZA,

    Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

    Defendant was charged with first-degree murder, MCL 750.316, but convicted by a jury of second-degree murder, MCL 750.317. The Court of Appeals reversed defendant's conviction and remanded the case for a new trial, reasoning that the trial court erred when it declined to give an involuntary-manslaughter instruction. This Court granted leave to appeal to consider whether manslaughter is an "inferior" offense of murder under MCL 768.32(1), and if so, whether a rational view

of the evidence supported an instruction in this case.

We conclude that manslaughter is an inferior offense of murder.  However, an involuntary-manslaughter instruction was not appropriate in this case because a rational view of the evidence did not support it.  Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant's conviction.  To the extent that *People v Van Wyck*, 402 Mich 266; 262 NW2d 638 (1978), and its progeny conflict with this opinion, they are overruled.

## I.  FACTS AND PROCEDURAL HISTORY

Defendant and codefendant Ivan Tims visited the home of victim William Stockdale and Stockdale's nephew, Thurman Chillers, with the intent to purchase marijuana.  Tims initially waited outside in the car while defendant discussed the price of the drugs with Stockdale and Chillers in the house.  Agreeing on a price, defendant indicated to Stockdale that he had to return to the car to get additional money.  When defendant returned to the house, he was accompanied by Tims.  Both men brandished handguns.

Chillers testified that, upon entering the home, defendant instructed Tims to "shoot him."  In response, Tims alternately pointed his gun at Chillers and Stockdale.  Stockdale, in turn, rushed at defendant, grabbed defendant's gun and swung it downwards.  Chillers ran out of the house.

2

As he ran, he saw Stockdale "tussling" with defendant. Chillers further testified that he heard one shot while he was in the house and four or five more shots when he was outside. In the end, Stockdale was shot twice, once in the leg and once in the chest. The chest wound proved fatal.

Defendant was charged with first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony, MCL 750.227b. His defense was that Tims shot Stockdale. Defendant elicited testimony from various witnesses establishing that defendant was not in the house when the victim was fatally wounded and that the fatal bullet came from a gun traceable to Tims.

At the close of proofs, defendant requested instructions for voluntary and involuntary manslaughter, MCL 750.321, and careless, reckless, or negligent discharge of a firearm, MCL 752.861. The trial court denied the requests and instructed the jury on first-degree murder, MCL 750.316, and second-degree murder, MCL 750.317. Defendant was convicted of second-degree murder and felony-firearm.

The Court of Appeals reversed defendant's conviction and remanded the case for a new trial. The panel treated the manslaughter-instruction requests as requests for instructions on a "cognate" lesser included offense and concluded that the trial court erred in refusing to give the involuntary-

3

manslaughter instruction because there was evidence from which the jury could conclude that the victim's death was unintended and occurred while defendant was engaged in an unlawful act not amounting to a felony.  Slip op at 2.

The prosecutor applied for leave to appeal.[1]  We granted leave to consider whether manslaughter is an inferior offense of murder within the meaning of MCL 768.32 and, if so, whether an involuntary-manslaughter instruction was supported by a rational view of the evidence.

## II.  STANDARD OF REVIEW

Whether manslaughter is an inferior offense of murder within the meaning of MCL 768.32 is a question of law that the Court reviews de novo.  *Weakland v Toledo Engineering Co*, 467 Mich 344, 347; 656 NW2d 175 (2003).

## III.  ANALYSIS

### A.  MCL 768.32

MCL 768.32 governs inferior-offense instructions. Subsection 1 provides in pertinent part:

> . . .[U]pon an indictment for an offense, consisting of different degrees, as prescribed in this chapter, the jury, or the judge in a trial without a jury, may find the accused not guilty of the offense in the degree charged in the indictment and may find the accused person guilty of a degree

---

[1]Defendant did not cross-appeal to challenge the judgment of the Court of Appeals affirming the trial court's decision not to give instructions on voluntary manslaughter or careless use of a firearm.

of that offense inferior to that charged in the indictment, or of an attempt to commit that offense.

We recently examined this statute in *People v Cornell*, 466 Mich 335; 646 NW2d 127 (2002).[2] In *Cornell*, the Court considered whether necessarily included lesser offenses[3] and cognate lesser included offenses[4] were "inferior" offenses under MCL 768.32. In consideration of this issue, we examined the meaning of the word "inferior":

> "We believe that the word 'inferior' in [MCL 768.32] does not refer to inferiority in the penalty associated with the offense, but, rather, to the absence of an element that distinguishes the charged offense from the lesser offense. The controlling factor is whether the lesser offense can be proved by the same facts that are used to establish the charged offense." [*Cornell*, *supra* at 354, quoting *People v Torres (On Remand)*, 222 Mich

---

[2]The dissent criticizes the construction of MCL 768.32 set forth in *Cornell*, arguing that the Court should apply the dictionary definition of "inferior."

We are confident that we applied the appropriate canon of statutory construction in construing MCL 768.32 by giving "inferior offense" its common-law meaning when it was codified by the Legislature. See *Pulver v Dundee Cement Co*, 445 Mich 68, 75; 515 NW2d 728 (1994)("words and phrases that have acquired a unique meaning at common law are interpreted as having the same meaning when used in statutes dealing with the same subject").

[3]Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense. *Cornell*, *supra* at 356.

[4]Cognate offenses share several elements, and are of the same class or category as the greater offense, but the cognate lesser offense has some elements not found in the greater offense. *Cornell*, *supra* at 344.

5

App 411, 419-420; 564 NW2d 149 (1997)].

Relying on this definition of "inferior," this Court concluded that MCL 768.32 only permitted consideration of necessarily included lesser offenses. *Cornell, supra* at 353-354. Thus, we held that an inferior-offense instruction is appropriate only if the lesser offense is necessarily included in the greater offense, meaning, all the elements of the lesser offense are included in the greater offense, and a rational view of the evidence would support such an instruction.[5] *Id.* at 357.

---

[5]The dissent criticizes the majority opinion for adopting "obiter dictum" from *Cornell* to conclude that inferior offenses are limited to necessarily included lesser offenses. We disagree with this mischaracterization of *Cornell's* analysis.

In *Cornell*, the Court was charged with the task of construing MCL 768.32(1), because MCL 768.32(1) governs when instructions are given for "inferior" offenses. To that end, we expressly adopted Justice COLEMAN's dissent in *Jones*, *infra*, which would foreclose consideration of cognate lesser included offenses. *Cornell, supra* at 353. See also *Cornell, supra* at 356 n 9, in which we state, "as we have already explained, the wording of MCL 768.32 also limits consideration of lesser offenses to necessarily included lesser offenses." We then expressly held that a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires a jury to find a disputed factual element that is not part of the lesser offense and a rational view of the evidence would support it. *Id*. at 357.

Accordingly, we disagree with the dissent's characterization of the *Cornell* analysis as "obiter dictum." Rather, the *Cornell* discussion of the limits of MCL 768.32 was central to our construction of the statute and thus central to the resolution of the issues before the *Cornell* Court.

6

### B. Manslaughter Is An Inferior Offense Of Murder

Manslaughter is an inferior offense of murder because manslaughter is a necessarily included lesser offense of murder.

#### 1. The Elements Of Common-Law Murder And Manslaughter

Common-law murder encompasses all killings done with malice aforethought and without justification or excuse. *People v Scott*, 6 Mich 287, 292-293 (1859).  See also *People v Potter*, 5 Mich 1, 6 (1858)("Murder is where a person of sound memory and discretion unlawfully kills any reasonable creature in being, in the peace of the state, with malice prepense or aforethought, either express or implied.").

First-degree murder is defined in MCL 750.316.[6]  All

---

[6]MCL 750.316 provides in pertinent part:

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping.

(c) A murder of a peace officer or a corrections

7

other murders are murders in the second degree.  MCL 750.317.

See also *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868

(1998), which enumerated the elements of second-degree murder

as (1) death, (2) caused by defendant's act, (3) with malice,

and (4) without justification.

Manslaughter is murder without malice.  See *Potter*, *supra*

at 9 (noting that without malice aforethought, "a killing

would be only manslaughter, if criminal at all").  See also

*People v Palmer*, 105 Mich 568, 576; 63 NW 656 (1895),

remarking:

> "Manslaughter is perfectly distinguishable
> from murder, in this: That though the act that
> causes death be unlawful or willful, though
> attended with fatal results, yet malice, either
> expressed or implied, which is the very essence of
> murder, is to be presumed to be wanting in
> manslaughter." [Quoting the trial court jury
> instructions.]

The common law recognizes two forms of manslaughter: voluntary

---

officer committed while the peace officer or
corrections officer is lawfully engaged in the
performance of any of his or her duties as a peace
officer or corrections officer, knowing that the
peace officer or corrections officer is a peace
officer or corrections officer engaged in the
performance of his or her duty as a peace officer
or corrections officer.

Although first-degree murder is defined by statute, the
statute is understood to include the common-law definition of
murder.  See *People v Riddle,* 467 Mich 116, 125-126; 649 NW2d
30 (2002).  See also *People v Utter*, 217 Mich 74, 86; 185 NW
830 (1921).

and involuntary.  *People v Townes*, 391 Mich 578, 589; 218 NW2d 136 (1974).

Common-law voluntary manslaughter is defined as:

> [T]he act of killing, though intentional, [is] committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart or cruelty or recklessness of disposition . . . .[*Maher v People*, 10 Mich 212, 219 (1862).]

See also *Townes*, *supra* at 590 ("A defendant properly convicted of voluntary manslaughter is a person who has acted out of a temporary excitement induced by an adequate provocation and not from the deliberation and reflection that marks the crime of murder.").  Thus, to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions.  See *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991).[7]  Significantly, provocation is not an element of voluntary manslaughter.  See *People v Moore*, 189

---

[7]In addition to common-law manslaughter, the Legislature has also determined that manslaughter shall exist in several other circumstances.  See, e.g., MCL 750.322 (the willful killing of an unborn child by injury to its mother), MCL 750.323 (the killing of a quick child by use of medicine or an instrument, and MCL 750.329 (a killing committed without malice by means of an intentionally aimed firearm).

9

Mich App 315, 320; 472 NW2d 1 (1991).  Rather, provocation is the circumstance that negates the presence of malice.  *Scott*, *supra* at 295.

Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty.  See *Townes*, *supra* at 590.  See also *People v Helfin*, 434 Mich 482, 507-508; 456 NW2d 10 (1990)(opinion by RILEY, C.J.).

2.  THE SOLE ELEMENT DISTINGUISHING MANSLAUGHTER AND MURDER IS MALICE

An examination of the historical development of homicide law informs this Court that manslaughter is a necessarily included lesser offense of murder because the elements of manslaughter are included in the offense of murder.

a.  HOMICIDE IN ENGLISH COMMON LAW

In early English common law, a killing was either justifiable homicide; excusable murder committed by misadventure or accident, or in self-defense; or capital murder, characterized by "malice aforethought" and punishable by death.  See 2 Pollock and Maitland, *The History of English Law* (Cambridge:  University Press, 1952), ch VIII, Crime and Tort, § 2, p 485.  However, during the fourteenth and

10

fifteenth centuries, an exemption called the "benefit of clergy" was widely used as a device to mitigate mandatory death sentences.  Hall, *Legal fictions and moral reasoning: Capital punishment and the mentally retarded defendant after Penry v Johnson*, 35 Akron L R 327, 353 (2002).

The "benefit of clergy" was an exemption that allowed an offender to be sentenced by the ecclesiastical courts, which did not impose capital punishment.[8]  Though it was initially intended to benefit clergy, it also benefitted persons who could satisfy its literacy test.  See Kealy, *Hunting the dragon: Reforming the Massachusetts murder statute*, 10 B U Pub Int L J 203, 205-206 (2001).  Thus, it was not long before persons other than clerics claimed the exemption, so that the "benefit of clergy" exemption benefitted *anyone* who could read.  See Justice Harlan's discussion in *McGautha v California*, 402 US 183, 197; 91 S Ct 1454; 28 L Ed 2d 711 (1971), noting that although all criminal homicides were prima facie capital cases, the "benefit of clergy" was available to almost any man who could read.

In response to the exemption's widespread availability, statutes were passed throughout the fifteenth and sixteenth

---

[8]The "benefit of clergy" was a political compromise between the state and the church, intended to ensure errant clerics who were convicted in the royal court were turned over to the ecclesiastical courts for sentencing.

centuries proclaiming the exemption unavailable for homicides committed under particularly reviled circumstances, collectively termed "murder with malice aforethought." Moreland, *The Law of Homicide* (Indianapolis: The Bobbs-Merrill Co, Inc, 1952), ch 2, The Development of Malice Aforethought, p 9. The "benefit of clergy" remained available, however, for offenders convicted of less culpable homicides. *Id.* Thereafter, unjustified and unexcused homicide was divided into two separate crimes: "wilful murder of malice aforethought", a capital offense for which the "benefit of clergy" was unavailable, and manslaughter. Plucknett, *A Concise History of the Common Law* (New York: The Lawyers Co-Operative Pub Co, 1927), ch 2, The Felonies, pp 395-396. The critical difference between murder and manslaughter was the presence or absence of "malice aforethought." Moreland, *supra* at 10.

b. "MALICE AFORETHOUGHT"

The phrase "malice aforethought" has evolved over the centuries. During the late fifteenth and early sixteenth centuries, "malice aforethought" meant that one possessed an intent to kill well in advance of the act itself. *Id.* at 10. Notably, the emphasis was on "aforethought," so that the critical difference between capital and noncapital murder was the passage of time between the initial formulation of the

12

intent to kill and the act itself.  Moylan, Criminal Homicide Law (Maryland Institute for Continuing Professional Education of Lawyers), ch 2, § 2.7.  The term "malice" alone had little significance beyond meaning an intent to commit an unjustified and unexcusable killing.  *Id.* The purpose of the "malice aforethought" element was to distinguish between deliberate, calculated homicides and homicides committed in the heat of passion. Kealy, *supra* at 206.

As more and more defendants claimed they lacked an intent to kill before the act was committed, juries and courts increasingly rejected this argument.  The result was a case-by-case "semantic erosion" of the term "aforethought," until "malice aforethought" meant nothing more than the intent to kill had to exist *at the time* the act was committed. Perkins & Boyce, Criminal Law (3rd ed), Murder, § 1, p 58 ("[a]s case after case came before the courts for determination . . . there came to be less and less emphasis upon the notion of a well-laid plan.  And at the present day, the only requirement in this regard is that it must not be an *after*thought"). There was, consequently, a parallel erosion of the distinction between capital murder, for which aforethought was required, and noncapital homicide, for which it was not.

Interestingly, although the English courts grew weary of the oft abused "lack of aforethought" defense, it was

nevertheless evident that there was still some interest in distinguishing between a homicide committed in "cold-blood" and one committed under circumstances that mitigated one's culpability. To express this distinction, the focus shifted from "aforethought" to "malice." Moreland, *supra* at 11 ("[t]he law of homicide seems thus to have now progressed from a place where the mental element was of no importance to a place where at the beginning of the seventeenth century it had become a factor of prime importance").

Because there was a need to distinguish the most serious homicide from the rest, and because "aforethought" no longer had legal significance, malice evolved from being merely an intent to kill to also evidencing the absence of mitigating circumstances. Moylan, *supra* at § 2.7. Consequently, the presence of malice became both synonymous with the absence of mitigating circumstances and the sole element distinguishing murder from manslaughter.

We glean from our examination of manslaughter's historical development that manslaughter is defined to reflect the absence of malice. Thus, the only element distinguishing murder from manslaughter is malice.

3. MANSLAUGHTER IS A NECESSARILY LESSER INCLUDED OFFENSE OF MURDER

A necessarily lesser included offense is an offense whose elements are completely subsumed in the greater offense.

*Cornell, supra* at 356.

Regarding voluntary manslaughter, both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. However, the element distinguishing murder from manslaughter—malice—is negated by the presence of provocation and heat of passion. See *Scott, supra* at 295. Thus, we conclude, the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice.

Regarding involuntary manslaughter, the lack of malice is evidenced by involuntary manslaughter's diminished mens rea, which is included in murder's greater mens rea. See *People v Datema*, 448 Mich 585, 606; 533 NW2d 272 (1995), stating:

> "[P]ains should be taken not to define [the mens rea required for involuntary manslaughter] in terms of a wanton *and* wilful disregard of a harmful consequence known to be likely to result, *because such a state of mind goes beyond negligence and comes under the head of malice*."
>
> Unlike murder, involuntary manslaughter contemplates an unintended result and thus requires something less than an intent to do great bodily harm, an intent to kill, or the wanton and wilful disregard of its natural consequences. [Citations omitted; emphasis added.]

See also *United States v Browner*, 889 F2d 549, 553 (CA 5,

15

1989), stating, "In contrast to the case of voluntary manslaughter . . . the absence of malice in involuntary manslaughter arises not because of provocation induced passion, but rather because the offender's mental state is not sufficiently culpable to reach the traditional malice requirements."

Thus, we conclude that the elements of involuntary manslaughter are included in the offense of murder because involuntary manslaughter's mens rea is included in murder's greater mens rea.

Accordingly, we hold the elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder. Because voluntary and involuntary manslaughter are necessarily included lesser offenses, they are also "inferior" offenses within the scope of MCL 768.32. Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. *Cornell*, *supra*.

4. TODAY'S HOLDING IS CONSISTENT WITH EARLY MICHIGAN COMMON LAW

Today's holding is consistent with our courts' historical understanding of the law of murder. Michigan courts have historically concluded that a manslaughter instruction is

16

appropriate on a murder charge if a manslaughter instruction is supported by a rational view of the evidence. See, e.g., *Hanna v People*, 19 Mich 316, 321 (1869)(in consideration of MCL 768.32's similarly worded predecessor, "without this provision, the common law rule would, under the statute, dividing murder into degrees, have authorized a conviction not only for murder in the second degree, but for manslaughter also, under an indictment for murder in the first degree, *all these being felonies included in the charge*")(emphasis added). See *People v Treichel*, 229 Mich 303, 307-308; 200 NW 950 (1924), stating:

> This Court has repeatedly held, where the charge as laid includes murder in the first degree, and the proofs establish such degree, and no lesser degree, it is not error for the court to instruct the jury that, in order to convict, murder in the first degree must be found. But this court has not held, under a charge like here laid, the court *must* instruct the jury to find murder in the first degree or acquit. Whether such an instruction may be given or not depends upon the evidence. [Emphasis in original.]

> [In this case, the] information charged murder in the first and second degrees, and this was inclusive of manslaughter. The evidence left it open for the jury to find defendants guilty of manslaughter.

See also *People v Droste*, 160 Mich 66, 78-79; 125 NW 87 (1910)(concluding that the trial court was "clearly warranted" in instructing the jury on manslaughter in a murder case because a jury could have concluded there was sufficient

17

intoxication or passion to "rob [defendant's] act of the necessary elements of murder"); *People v Andrus*, 331 Mich 535, 546-547; 50 NW2d 310 (1951)(remarking that it was proper for the court to submit the lesser included offenses of second-degree murder and manslaughter because the evidence was sufficient to support the offense).

It was not until this Court overlooked MCL 768.32, and introduced "cognate" lesser included offenses, that the relationship between manslaughter and murder became muddled. In *People v Jones*, 395 Mich 379; 236 NW2d 461 (1975), this Court, without consideration of MCL 768.32, recognized a new category of lesser included offenses called "cognate" offenses. Cognate offenses differed from necessarily included lesser offenses in that cognate offenses share with the higher offense several elements and are of the same class or category, but they contain elements not found in the higher offense. See *Cornell*, *supra* at 344-346. Faced with a category of lesser included offenses not previously recognized in Michigan, this Court, in *Van Wyck*, *supra*, concluded that manslaughter was a cognate lesser included offense of murder:

> We hold that manslaughter is not a necessarily included offense within the crime of murder but that it may nonetheless be an included offense if the evidence adduced at trial would support a verdict of guilty for that crime.

18

As we noted in *People v Ora Jones, supra*:

> "The common-law definition of lesser included offenses is that the lesser must be such that it is impossible to commit the greater without first having committed the lesser." [Citation omitted.]

> * * *

> [With regard to the murder/manslaughter relationship], [t]he absence of mitigating circumstances need not be established in order to convict one of first- or second-degree murder. Consequently, it cannot be said voluntary manslaughter is a necessarily included offense within the crime of murder; it is incorrect to state that it is impossible to commit first- or second-degree murder without having first committed manslaughter. [*Van Wyck, supra* at 268-269.]

Notably, the *Van Wyck* Court failed to discuss earlier common-law decisions characterizing manslaughter as a lesser included offense of murder before cognate offenses were recognized. We also note that the *Van Wyck* Court did not give any consideration to the unique relationship between murder and manslaughter.

For the reasons discussed above, we conclude manslaughter is a *necessarily* included lesser offense of murder. We further conclude that *Van Wyck*'s analysis is flawed inasmuch as it is premised on a body of law recognizing cognate lesser included offenses in contravention of MCL 768.32. Accordingly, to the extent that *Van Wyck* and its progeny are inconsistent with this opinion and our opinion in *Cornell*, they are expressly overruled.

19

## C.  An Involuntary-Manslaughter Instruction Was Not Warranted

Having concluded that manslaughter is an inferior offense of murder because it is a necessarily included lesser offense, we now consider whether the trial court erred in refusing to give an involuntary-manslaughter instruction.

An inferior-offense instruction is appropriate only when a rational view of the evidence supports a conviction for the lesser offense.  *Cornell*, *supra* at 357.  In this case, the Court of Appeals concluded there was sufficient evidence to support an involuntary-manslaughter instruction.  In reaching this conclusion, the Court relied on defendant's statement to the police recounting what happened:

> I was at a gas station on Seven Mile near Hoover when Ivan pulled up in a gray newer model car and asked me did I want some bud.  Ivan asked me did I have half on it.  I said, yes.  I then got into the car with Ivan.  Ivan stopped by one house, then he went to the bud house.  When we got to the house, Ivan stayed in the car and I went to the house.  When I got to the front door, there was a big guy coming out and motioned for me just to go on in.  The guy that let me in continued talking to a big dark-skinned guy with a deep voice.  Another guy, kind of frail [Chillers], sitting in a love seat asked me how many I needed.  I responded by saying, just one back.  That's when Ivan came to the door.  Ivan started talking to the guy with the deep voice.  The guy that let me in then left.  I started to get my stuff from the frail guy.  While I'm getting my stuff, I heard some tussling.  I look back and Ivan was tussling with the big guy with the deep voice.  They were tussling over a handgun with a dark barrel.  While they were tussling, I heard approximately two shots.  They then fell into a corner over a chair.  I then heard the frail guy holler.  He had pulled out a shiny

20

revolver and pointed it at Ivan and the guy he was tussling with. *I then tried to knock the gun away from [Chillers]. As I was attempting to knock the gun away from [Chillers], he pulled the trigger.* I then tried to run but I tripped over Ivan . . . . [Emphasis added.]

The Court of Appeals concluded that defendant's statement that Chillers pulled the trigger when defendant tried to knock the gun away from him was sufficient to support an involuntary-manslaughter conviction. The Court reasoned that defendant's statement could support a finding that the victim's killing was an unintended death, without malice, and not caused by any action of defendant naturally tending to cause death.

We disagree and conclude that defendant's statement alone is insufficient to support an involuntary-manslaughter instruction. Defendant's statement does not indicate that the shot fired during the struggle struck or killed the victim. In fact, during his request for an involuntary-manslaughter instruction, defendant argued that the shot fired during the struggle was the nonfatal shot to the victim's leg.[9]

_____

[9]Defense counsel argued in support of the manslaughter instruction as follows:

> Alternatively there's also involuntary manslaughter, now that I think about it, in terms of that gun potentially accidentally [sic] going off during the struggle over the gun at the time it's discharged. *That's how I claim that the shot to the leg happened, when they were struggling over the gun."* [Emphasis added.]

21

Therefore, because there is no evidence that the shot fired during the struggle killed the victim, and in light of the substantial evidence that the shot was *not* the fatal shot, we conclude a rational view of the evidence does not support an involuntary-manslaughter instruction.

We further disagree with the conclusion of the Court of Appeals that an instruction for common-law involuntary manslaughter was premised on defendant's theory of the case. Defendant's theory throughout trial was that someone else was responsible for the victim's death. Consider defendant's opening statement, in which he sets forth his theory:

> What really occurred in this situation that you'll see is sure, my client Mr. Mendoza and Mr. Tims went over to that location. They didn't go over there to harm anybody. They went over there to buy what Mr. Stockdale and what Mr. Chillers were in the business to sell, which is marijuana . . .

> * * *

> You'll hear that, that Mr. Tims . . . and another person were tussling over a handgun. And while they're tussling, shots went off. And my client went over there to try to prevent that from happening. And that's when the tussle broke out. When my client's running out of that location, he gets shot by Mr. Chillers.

> *So, it's not my client that's doing any shooting in there. It's Mr. Chillers who's causing all these problems and doing shooting in there.*

---

Expert testimony established that the leg wound was not the fatal injury.

22

* * *

> So, what happened here is after my client, after he's running away and Mr. Chillers shoots him and he's running to the car wounded, Mr. Tims on his own goes back up to that front door with that revolver in his hand and started shooting into the house. *And that's when Mr. Stockdale gets shot in the chest.*

* * *

> This is what I believe the evidence will show . . . That gun was never in the possession of Mr. Mendoza. That gun was the one identified as being in the hands of Mr. Tims when he went back on his own. [Emphasis added.]

It is, therefore, clear that defendant's theory was that Tims was responsible for the victim's death.

In sum, we conclude that a rational view of the evidence did not support an involuntary-manslaughter instruction. Therefore, it was not error for the trial court to deny the instruction. Accordingly, we reverse the judgment of the Court of Appeals.

### IV. CONCLUSION

Manslaughter, in both its forms, is an inferior offense of murder within the meaning of MCL 768.32. Therefore, an instruction is warranted when a rational view of the evidence would support it. *Van Wyck* and its progeny are overruled to the extent the *Van Wyck* analysis of the relationship between manslaughter and murder holds otherwise.

In this case, we conclude a rational view of the evidence did not support an involuntary-manslaughter instruction.

23

Therefore, the trial court did not err when it refused to give the instruction. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant's second-degree murder conviction.

Robert P. Young, Jr.
Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Stephen J. Markman

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

v                                         No. 120630

RICHARD MENDOZA,

    Defendant-Appellee.

_____

CAVANAGH, J. (*concurring*).

This Court granted leave to appeal to determine whether MCL 768.32 permits a manslaughter instruction when a defendant has been charged with murder. Because the majority has misinterpreted MCL 768.32, I must respectfully dissent from its analysis, though I concur in its result.

The majority applies obiter dictum from *People v Cornell*, 466 Mich 335; 646 NW2d 127 (2002), to hold that an "inferior" offense, as articulated by the Legislature in 1846, is limited to a necessarily included lesser offense.[10] While I agree that manslaughter is an offense inferior to and necessarily included within the crime of murder, I do not agree that this

_____

[10] MCL 768.32, formerly codified as tit XXX, ch 161, § 16, Rev Stat of 1846.

Court should limit instructions authorized by MCL 768.32 to only those that are necessarily included in the charged offense. Rather, I would hold that, when requested, a jury may be instructed on lesser or "inferior" offenses of the crime charged, if those offenses are supported by the evidence.

I

The proper scope of MCL 768.32 presents a question of statutory interpretation, which we review de novo. *In re MCI,* 460 Mich 396, 413; 596 NW2d 164 (1999).

II

The relevant portion of MCL 768.32 now provides:

> (1) Except as provided in subsection (2), upon an indictment for an offense, consisting of different degrees, as prescribed in this chapter, the jury, or the judge in a trial without a jury, may find the accused not guilty of the offense in the degree charged in the indictment and may find the accused person guilty of a degree of that offense inferior to that charged in the indictment, or of an attempt to commit that offense.[11]

Relying on established doctrines of interpretation, one

---

[11] The current subsection 2 refers to controlled-substance provisions. The original statute provided:

> Upon an indictment for any offence, consisting of different degrees, as prescribed in this title, the jury may find the accused not guilty of the offence in the degree charged in the indictment, and may find such accused person guilty of any degree of such offence, inferior to that charged in the indictment, or of an attempt to commit such offence. [Rev Stat of 1846, tit XXX, ch 161, § 16.]

cannot disagree that the first step in discerning legislative intent requires review of the statutory text adopted by the Legislature. *House Speaker v State Administrative Bd,* 441 Mich 547, 567; 495 NW2d 539 (1993). See also MCL 8.3a ("All words and phrases shall be construed and understood according to the common and approved usage of the language . . . ."). If unambiguous, the Legislature will be presumed to have intended the meaning expressed. *Lorencz v Ford Motor Co,* 439 Mich 370, 376; 483 NW2d 844 (1992). We often refer to the dictionary to discern a statute's plain meaning. See *Wayne Co Prosecuting Attorney v Levenburg & Richmond,* 406 Mich 455, 465-466; 280 NW2d 810 (1979) (dictionaries provide plain meaning).

The dispositive issue presented for review is the scope of the term "inferior," which may be defined as follows:

> Inferior. 1. Lower in place. 2. Lower in station, age, or rank in life. 3. Lower in excellence or value; as a poem of inferior merit. 4. Subordinate; of less importance. [American Dictionary of the English Language, Noah Webster, Vol. 1, (originally published 1828, reprinted 1970).[12]]

---

[12] See also:

> Inferior. Is usually employed in law to designate the lower of two grades of authority, jurisdiction, or power. [Dictionary of Terms and Phrases used in American or English Jurisprudence, Vol 1, p 603 (1879).]

(continued...)

This definition has changed little since the nineteenth century, and the meaning of an offense "inferior" to another continues to suggest a lower offense, or one that is somehow *less* than the charged crime.[13]   Applied here, this interpretation supports a "lesser offense" approach.

In spite of this textual evidence, the majority would prefer to adopt a "necessarily included lesser offense" interpretation, assigning a meaning to "inferior" that is contrary to its everyday usage, while providing no textual explanation for its narrow construction.   Instead, the majority adopts its obiter dictum from *Cornell* and relies on several prudential (i.e., policy-based) reasons to reject an

_____

(...continued)

Inferior. 1. Lower in position; situated below . . . 3. Lower in degree, rank, importance, quality, amount, or other respect; of less value or consideration; lesser; subordinate.  With *to* = lower than, less than, not so good or great as; unequal to . . . . [*Oxford English Dictionary* (2d ed).]

Inferior. . . 3. Lower in degree, rank, importance, quality, amount, or other respect; of less value or consideration . . . b. with *to* = lower than, less than, not so good or great as; unequal to. [*A New English Dictionary on Historical Principles*, Murray, Oxford (1901, originally published 1888).]

[13] Inferior.  adj. 1. Situated under or beneath.  2. Low or lower in order, degree, or rank.  3. Low or lower in quality, status, or estimation. [*American Heritage Dictionary of the English Language*, New College Edition (1981).]

interpretation of "inferior" that conforms with its everyday usage.

Foremost among the majority's rationale may be the alleged ease with which the necessarily included lesser offense framework may be applied. *Cornell, supra*. However, I cannot agree that the majority's framework can be applied more simply than a "lesser offense" inquiry because each varies on the basis of the degree of specificity with which one reviews the elements of a crime. This Court, for example, has wavered on the precise issue presented here. In *People v Van Wyck*, 402 Mich 266; 262 NW2d 638 (1978), this Court held that manslaughter was *not* a necessarily included lesser offense of murder:

> The absence of mitigating circumstances need not be established in order to convict one of first- or second-degree murder. Consequently, it cannot be said that voluntary manslaughter is a necessarily included offense within the crime of murder; it is incorrect to state that it is impossible to commit first- or second-degree murder without having first committed manslaughter. [*Id.* at 269.]

As the majority correctly notes today, when viewed in general terms, "the only element distinguishing murder from manslaughter is malice." *Ante* at 14. Hence, manslaughter is both an "inferior" and a necessarily included lesser offense of murder; the difference between *Van Wyck* and the Court's decision today results from the degree of precision employed

5

by the Court in its analysis of the elements of murder and manslaughter.

Instead of addressing such difficulties, the majority ignores this and similar inconsistencies. For example, although "felonious assault" is not strictly a necessarily included lesser offense of "assault with intent to do great bodily harm less than murder" because the former requires the use of a dangerous weapon, it is clearly an "inferior" charge as prescribed by any reasonable interpretation of the statute (i.e., "inferior"), yet the majority's approach provides no means by which to recognize this relationship. Similarly troubling, the crime of "assault with intent to do great bodily harm" is plainly included within the crime of "assault with intent to murder," but our Courts have held that different degrees of malice (i.e., intent to do great harm versus intent to murder) constitute cognate—not necessarily included—offenses. See, e.g., *People v Norwood,* unpublished opinion per curiam of the Court of Appeals, issued March 20, 2001 (Docket No. 218207). In sum, the majority's doctrine cannot logically provide the bright-line rule that it seeks, and its narrow construction is not supported by the text.

III

Although, I do not dispute that the meaning of MCL 768.32

6

has been subject to debate lately,[14] the majority has recently acknowledged that, as early as 1869, this Court permitted convictions on "inferior" offenses:

> [E]xtending to all cases in which the statute has substantially, or in effect, recognized and provided for the punishment of offenses of different grades, or degrees of enormity, wherever the charge for the higher grade includes a charge for the less. In this view only, can any effect be given to it, as declaratory of, or altering the common law. [*Hanna v People,* 19 Mich 316, 322 (1869).]

Before *Cornell,* this Court repeatedly affirmed this lesser offense approach,[15] in accord with the plain meaning of

---

[14] *Cornell, supra* (noting in dicta that MCL 768.32 limits instructions to necessarily included lesser offenses and overruling, inter alia, *People v Jones,* 395 Mich 379; 236 NW2d 461 [1975], *People v Chamblis,* 395 Mich 408; 236 NW2d 473 [1975]).

[15] See also *People v Andrus,* 331 Mich 535; 50 NW2d 310 (1951) (noting this Court's treatment of MCL 768.32, which permits an instruction on lesser offenses when supported by the evidence); *People v Jones*, 273 Mich 430; 263 NW 417 (1935) (holding that the court erred so as to require reversal when it *affirmatively* excluded a lesser offense from the jury's consideration); *People v Abbott*, 97 Mich 484; 56 NW 862 (1893) (reversing where the court failed to instruct the jury on a lesser included offense); *People v Courier,* 79 Mich 366; 44 NW 571 (1890) (refusing the defendant's request for a new trial where the court *did* provide the jury with a lesser included rape offense instruction); *People v Prague,* 72 Mich 178; 40 NW 243 (1888) ("The crime of an assault with intent to commit the crime of murder is one of a higher grade and greater enormity than the crime of assault with intent to do great bodily harm less than the crime of murder. It belongs to the catalogue of offenses against the lives and persons of individuals, and we think the charge was authorized by the opinion of this Court in *Hanna* . . . ."); *People v Warner,* 53 Mich 78; 18 NW 568 (1884) (a conviction for simple assault may be had on any

(continued...)

7

the statute. In *People v Jones,* 395 Mich 379, 387; 236 NW2d 461 (1975), for example, this Court confirmed a case-by-case approach to inferior offense instructions, acknowledging that the strict, common-law rule, which had permitted lesser offense instructions only when necessarily included in the crime charged, had been *replaced* by a statute that authorized a broader range of convictions "inferior" to the crime charged. Although, the majority attempts to claim its holding has a historical foundation, it, in fact, usurps this Court's longstanding interpretation, which accords with the statute's plain meaning.

## IV

The majority may claim I have done nothing but pine for the "cognate" or related-offense approach, which it expressly rejected in *Cornell*. To the degree that a "cognate" offense is "inferior" to the crime charged, I cannot disagree. I remain committed to the "lesser included offense" interpretation of "inferior" simply because it is best able to honor the statutory text, as noted above.

---

(...continued)

information charging assault on an officer and resisting arrest); *Campbell v People*, 34 Mich 351 (1876) (". . . under an indictment charging a specific offense it was competent for the jury to find the respondent guilty of a lesser offense included in it. The lesser offense of felonious assault is necessarily included in the offense of rape; the completed offense being the aggravation of the criminal assault.").

Further, it accords with the longstanding doctrine that requires courts to construe criminal statutes in favor of defendants. In *United States v Wiltberger*, 18 US (5 Wheat) 76, 95; 5 L Ed 31 (1820), Chief Justice Marshall noted:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

See also *People v Webb,* 127 Mich 29, 32; 86 NW 406 (1901) ("Penal statutes must be strictly construed, and words used are to be given their popular, rather than a technical, meaning."); Scalia, *A Matter of Interpretation* (Princeton, N.J.; Princeton University Press, 1997), p 29 ("The rule of lenity is almost as old as the common law itself, so I suppose that is validated by sheer antiquity.") Its application here would give an accused the opportunity to request an instruction in conformity with defense theories, when supported by the evidence.

V

As noted, this Court today unanimously affirms that a defendant facing a murder charge may request a manslaughter instruction if supported by the evidence. However, nothing in the record would support an involuntary-manslaughter

conviction in this case, which requires a finding of death, caused by an act of defendant, with gross negligence. *People v Datema*, 448 Mich 585, 610-613; 533 NW2d 272 (1995) (Cavanagh, J., dissenting). Defendant's statement to the police suggests only that he attempted to prevent the alleged gunman from shooting his friend. On the facts presented, if the jury did not believe defendant was culpable of murder beyond a reasonable doubt, the only reasonable alternative was acquittal because defendant's statement to police indicated an attempt to save the life of another. *People v Heflin,* 434 Mich 482, 554 n 10; 456 NW2d 10 (1990) (Levin, J., dissenting) (noting that the defense of another may *justify* homicide). To permit a manslaughter conviction on the evidence presented would result in a conviction against the great weight of the evidence. Therefore, I agree that the Court of Appeals opinion should be vacated and that defendant's conviction should be affirmed.

VI

Because the majority has adopted an interpretation of MCL 768.32 contrary to its plain text and our long-settled rules of statutory construction, I cannot join its rationale. However, because I agree that manslaughter is an offense "inferior" to murder, and because the evidence does not support a manslaughter instruction, I concur in the result

only.

                              Michael F. Cavanagh
                              Marilyn Kelly